1
2
3
4
5                    **UNITED STATES DISTRICT COURT**

6                         **DISTRICT OF NEVADA**

7

8    PAMELA C. PETERSON,                          )
                                                  )
9                        Plaintiff,               )        Case No.  2:13-cv-01147-MMD-GWF
                                                  )
10   vs.                                          )        **FINDINGS AND**
                                                  )        **RECOMMENDATION**
11   CAROLYN W. COLVIN,                           )
     Acting Commissioner of Social Security,      )        Motion to Remand (#16)
12                                                )        Cross Motion to Affirm (#19)
                         Defendant.               )
13   _____)

14          This matter is before the Court on Plaintiff Pamela C. Peterson's Complaint for Review of

15   Final Decision of the Commissioner of Social Security (#1-1), filed on June 28, 2013.  Defendant's

16   Answer (#11) was filed on November 7, 2013, as was a certified copy of the Administrative Record

17   (the "AR").  *See Notice* (#12).  This matter has been submitted to the undersigned United States

18   Magistrate Judge for Findings and Recommendations on Plaintiff's Motion for Remand (#16), filed

19   on January 22, 2014.  The Acting Commissioner filed her Cross Motion to Affirm (#19) and

20   Opposition to Plaintiff's Motion for Remand (#20) on February 21, 2014.  No Reply was filed in

21   this matter.

22                              **BACKGROUND**

23          Plaintiff seeks judicial review of Administrative Law Judge Norman L. Bennett's ("ALJ")

24   decision denying her claim for Social Security disability benefits.  *See* Administrative Record

25   ("AR") 25-33.  The issue before the Court is whether the ALJ erred at step four of his analysis by

26   failing to articulate legitimate reasons for rejecting the opinions of Plaintiff's treating physician

27   relating to her alleged disability and for failing to provide clear and convincing reasons for finding

28   that Plaintiff's statements and testimony regarding the severity of her symptoms was not credible.

### A.     Procedural History.

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on March 11, 2010, alleging that she became disabled on November 21, 2008.  AR 137-141.  The application was denied initially and upon administrative reconsideration.  AR 25.  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  *Id*.  At a hearing on December 16, 2011, Plaintiff appeared with her attorney, Nicole Steinhaus, and testified in support of her claim.  AR 40-67.  Robin Generaux, a vocational expert, also appeared at the hearing.  *Id*.  In a decision dated January 5, 2012, ALJ Bennett found Plaintiff was not disabled within the meaning of the SSA.  *Id*.  Plaintiff timely filed a Request for Review, which was denied by the Appeals Council on May 6, 2013.  AR 1.  Plaintiff then filed this action for judicial review pursuant to 42 U.S.C. 405(g).  This matter has been referred to the undersigned for a report of findings and recommendations under 28 U.S.C. §§ 636 (b)(1)(B) and (C).

### B.     Factual History/Written Statements and Hearing Testimony.

Plaintiff Pamela Peterson was born on March 26, 1961.  AR 68.  She was almost 48 years old on the alleged onset date of her disability.  *Id*.  She is 5'5" and weighed 150 pounds at the time of the hearing.  AR 44.  Plaintiff resides with her husband and twelve year old daughter.  AR 44.  She indicated that she completed two years of community college and enrolled in a culinary arts program for a year and a half but never completed the program.  AR 45.  Her past employment included administrative assistant, office manager, engineering project administrator, food service worker/waitress, and cashier.  AR 49.

Plaintiff completed a written pain questionnaire on March 30, 2010 in which she stated that her pain symptoms began around 2006.  She stated that she had pain in the hands, arms, knees, neck and back.  On most days, her pain was 7 or 8 on a scale of 1-10.  The hand pain spread up her arms.  The neck pain causes headaches and back spasms.  Her knee pain spread up and down her legs.  Plaintiff indicated that she experienced pain on a daily basis.  Sitting brought on knee pain.  Standing caused back and neck spasms and knee pain.  Any consistent use of her hands caused hand and arm pain.  Plaintiff indicated that medication reduced her pain to a lower level.  She indicated that she was taking Lortab and Soma.  AR 156.  The Lortab caused some nausea and

drowsiness.  The Soma, which she took for muscle spasms, also caused drowsiness and some loss of muscle control.  AR 157.  Plaintiff stated that she had carpal tunnel surgery in November 2008 and left knee surgery in August 2009.  She used a knee brace when walking or standing for long periods, and also used hand/wrist braces for her carpal tunnel condition.  Exercise aggravated her pain and physical therapy after her surgeries only relieved her pain for a short period.  AR 157.

The questionnaire asked:   "What are your usual daily activities now that you have some pain?"  Plaintiff answered:  "Maintain household chores which brings on pain, drive kids to school and do errands, bill paying, grocery shopping.  Most activities, including filling out this form, brings on pain.  Holding pen, etc...".  AR 157.  Plaintiff stated that she was no longer able to lift dishes or trays with her hands and could not stand for long periods of time.  She also stated that sitting at a computer brings on hand pain, neck pain, back spasms, and knee pain.  Plaintiff stated that her pain began gradually affecting her in 2006, and then completely affected her prior to the surgeries in 2008.  In response to the question "[h]ow often do you have to stop an activity because of pain," Plaintiff stated "[a]ctivities involving hands require me to stop every 15 to 30 minutes. Sitting no more than 2 hours and standing usually about 30 minutes to an hour."  AR 158.  Plaintiff stated that she was able to go the post office or grocery store without assistance, but that she needed assistance to carry in groceries or boxes.  AR 158.  She stated that she was able to walk 2 to 3 blocks; to stand 30 to 60 minutes; and to sit no longer than 2 hours.  She was able to drive her own car, and do light housekeeping chores such as dusting and cooking without assistance.  She needed assistance to do sweeping and vacuuming, which hurt her hands.  She indicated that she could do a little at a time, but needed to stop or rest every 15 to 30 minutes.

In a function report dated April 10, 2010, Plaintiff described her daily activity as:

> [a]larm goes off at 6:30 AM.  Depending on the stiffness in my extremities and numbness I wake up my daughter to get ready for school make her lunch and carpool her and a couple neighborhood kids to school.  Returning around 8 AM .  I usually go to our custom built spa for joint & pain relief from 1-2 hrs.  Then I take meds and depending on pain level that I sometimes return to bed with ice packs and to try and get more sleep.  I don't sleep very well.  If I don't go back to bed, after meds have taken effect I usually try to pick 1 or 2 household things that need to be done I.E. a load laundry, dishes, dustin[g], paying bills, sweeping, and/or wet jet the wood floors. These chores begin around 11 AM and usually take me 3 to 4 hours

1
2
3
4

> to complete as I have to take many breaks.  2:15 pm pick up kids from school 4 to 5 pm I usually make dinner if I am not in much pain from the days tasks.  Family usually helps cleanup dinner or I save it for the following day.  Then I rest and watch tv and usually in bed by 8 or 9 pm.  I take my meds and try to get rest.  Some days the pain and depression that comes from day-to-day pain 7/24 keeps me in bed most of the day.  This happens 1 to 2 times a wk.

AR 174.

Plaintiff also reported that she cares for a cat and a 16 year old dog, which entailed feeding them and occasionally picking up their waste in the back yard.  AR 175.  She reported no longer being able to walk her dog.  *Id*.  With regard to recreational activities, she noted that she watches a lot of television, reads, uses the computer in 15-30 minute intervals, and talks to her mother on the telephone four to five times a week.  AR 178.

Plaintiff reported having trouble buttoning and zipping clothes, putting on jewelry, and sometimes having difficulty getting out of the bathtub due to her knee condition.  AR 175.  She stated that she shops for groceries once a week, but relies heavily on the bagger to load her groceries into her car.  AR 177.  She also takes her daughter clothes shopping once a month.  *Id.*  She indicated that she is unable to do yard work, but can prune rose bushes in stages because "anything using her hands causes pain threshold to worsen."  AR 176.  Plaintiff stated that "[a]nything I do has to be done in stages as standing or sitting or using hands for more than 15-30 minutes at a time drastically raises pain threshold."  *Id*.

On April 13, 2010, Plaintiff's husband, Brian Petersen, completed a function report for Plaintiff.  AR 184.  Mr. Peterson stated that the Plaintiff makes their daughter's lunch, carpools the children to and from school, does light chores around the house, reads, and watches television, with rest in between.  AR 184.  He reported that he and Ms. Petersen "sometimes take in a Vegas show" and his wife "gets involved with [their] daughter's after school activities and sports."  AR 184, 188.  He reported that Plaintiff is no longer able to play golf or bowl, but she rides along in the golf cart while he golfs two to three times a month and is able to ride her bike around the block once or twice a week.  AR 188.  Mr. Peterson stated that Plaintiff rarely gets more than 3-4 hours of sleep because of pain.  He stated that she gets up due to pain 3-4 times a night.  He also stated that she has difficulty using buttons or zippers while dressing or putting on jewelry due to pain.  She also

4

1    has to be careful getting out of the bath tub.  AR 185.

2        Plaintiff appeared for a hearing before the ALJ on the December 16, 2011.  AR 40-66.

3    Plaintiff testified that she started walking with a cane three months prior to the hearing because of

4    her knees.  AR 53.  She also indicated that she suffered a fall in the shower which apparently led to

5    her using the cane.  AR 54.  She also reported falling in the shower on other occasions.  AR 55.

6    Plaintiff testified that she can no longer push a grocery shopping cart and instead uses an electric

7    cart.  AR 54.  She does a lot of "light work as far as things that need to get done over the phone.  I

8    try to sit at the computer, but I'm quite heavy up here and the bending just causes major spasms and

9    hurts my hands and it makes my legs go numb.  So, I do some work."  AR 54.  She testified that

10   she used to do all the "house cleaning, all the grocery shopping, all the dishes, everything.  Soccer

11   mom, I car pooled all the kids and everything," but now her husband does about 95% of that.  AR

12   54.  She testified that if she does a load of towels in the washing machine, she is unable to pull

13   them out.  *Id.*  She dislocated her knuckle lifting a gallon of milk.  AR 54-55.  She testified that she

14   has problems concentrating, which causes her to forget names, miss appointments, and forget what

15   task she is completing.  AR 56.  She testified that her carpal tunnel surgery left her hands very

16   weak, leaving her unable to pick up a cup of coffee or plate without using both hands.  AR 59.  She

17   also has constant anxiety and depression.  AR 56-57.

18        **C.    Medical History**.

19        Plaintiff presented to Dr. Simon J. Farrow on October 9, 2008 with complaints of general

20   joint pain and other somatic symptoms particularly affecting the arms and hands.  AR 212.

21   Plaintiff reported that she had chronic pain in all of her joints for some time, which she related to

22   her job as a food server carrying heavy trays.  *Id.*  She also reported waking up in the middle of the

23   night with numb fingers, particularly in the fingertips.  *Id.*  Dr. Farrow stated that the Plaintiff's

24   general appearance was unremarkable and her hands, arms and shoulders were unremarkable on

25   inspection, but that she had "[s]eemingly disproportionate and generalized reaction to palpitation

26   and manipulation."  Her affect appeared normal.  She was "not obviously depressed, excessively

27   anxious, hypomanic or pressurized."  Her cognitive function appeared normal.  Dr. Farrow stated

28   that he was unsure what was causing Plaintiff's joint tenderness.  He stated, "Nothing much to

                                         5

suggest radiculopathy.  Stories suggestive of carpal tunnel syndrome.  We did do electrodiagnostic studies.  Results suggested possible but not severe." AR 212-13.

Plaintiff saw Dr. Farrow for a follow-up evaluation on October 21, 2008.  AR 219.  He noted that electrodiagnostic studies were strongly consistent with carpal tunnel syndrome on the left and suggestive on the right.  *Id*.  Dr. Farrow diagnosed Plaintiff with bilateral carpal tunnel syndrome, worse on the left and shoulder girdle muscle tension syndrome with arthropathy.  *Id*.  He noted that braces had not worked and Plaintiff did not want to try injections.  *Id*.  He suggested possible hand surgery to correct the carpal tunnel and to then revisit Plaintiff to see how her neck and shoulders were doing.  *Id*.

On November 6, 2008, Dr. Archie D. Perry performed bilateral carpal tunnel release surgery on Plaintiff.  AR 225, 234.  On November 17, 2008, Dr. Perry noted that Plaintiff was grossly neurologically intact and doing fine.  AR 233.  He scheduled her for removal of the sutures in one week and to start hand therapy.  *Id*.  After seven to eight sessions of hand therapy, Plaintiff continued to report pain over her left wrist scar and in the left thumb.  AR 225.  On January 15, 2009, she was seen by Dr. Perry for re-evaluation.  AR 230.  He noted that she had not returned to the office as recommended and had been dealing with therapy on her own, due to the cost, which aggravated her condition.  AR 230-231.  He stated:

> For the wrist, she notes ongoing pain in the wrist and sensitivity to touch.  She has been using the Jacuzzi and placing the jets on her wrist and placing heat on a regular basis.  She is definitely better than she was before the surgery, but still bothersome, affecting the left wrist more than the right wrist.

AR 230.

Dr. Perry referred Plaintiff to Dr. Michael Lee, an orthopedic hand surgeon, for a consultation regarding her thumb pain.  AR 228.   Plaintiff was seen by Dr. Lee on February 23, 2009.  AR 225.  Plaintiff reported having pain over the left wrist scar and in the left thumb.  *Id*.  She also reported having some mild pain in her right hand with which she was not concerned.  *Id*.  Physical examination of Plaintiff revealed near full range of motion in her left wrist and hand.  *Id*.  X-rays of her right and left hands demonstrated no acute fracture or dislocation and minimal degenerative changes.  AR 226.  Dr. Lee opined that Plaintiff did have some improvement

6

following the carpal tunnel release surgery, but he was uncertain as to why her thumb continued to hurt. *Id*. He reported seeing no evidence of "triggering or instability." *Id*. He diagnosed her with bilateral hand pain, left greater than right, and recommended observation, anti-inflammatory medications, steroid injections, additional therapy, or second opinion consultation as her treatment options. *Id*. Dr. Lee further stated:

> At this point, all the patient wants is pain medication and is requesting Lortab and Soma. Because I am concerned that this patient may need to be on chronic pain medication, my recommendation is referral to a pain management doctor, who can follow her appropriately. ... I offered her a 1-month followup, but she prefers to be discharged from care and will return if she desires any additional treatment.

AR 226.

On March 2, 2009, an x-ray of Plaintiff's right hand was performed at Lake Mead Radiologists. AR 254. The radiologist reported that no fracture was noted. Plaintiff's joint alignment and soft tissues were unremarkable, her bone density and morphology were within normal limits, and there was no evidence of radiopaque foreign body. *Id*.

On June 17, 2009, Plaintiff saw Dr. Steven C. Thomas with complaints of left knee pain. AR 258. Plaintiff described the pain as a "sensation of giving way." *Id*. A neurological system examination revealed normal sensation bilaterally and her motor exam was grossly intact bilaterally. AR 259. Imaging studies revealed no significant bony abnormality. *Id*. Dr. Thomas diagnosed Plaintiff with a probable meniscal tear or cartilage lesion. Treatment options were discussed and Plaintiff opted to proceed with arthroscopic treatment. *Id*. On July 2, 2009, Dr. Thomas performed an arthroplasty with drilling patella, partial lateral meniscectomy, and articular cartilage debridement of the patella on Plaintiff's left knee. AR 263. On July 7, 2009, Plaintiff reported to Dr. Thomas for a post-operation status check. AR 269. Due to her reported calf tenderness and the severity of her discomfort, Dr. Thomas recommended that Plaintiff undergo a Doppler ultrasound to rule out possible deep venous thrombosis. *Id*. The ultrasound examination revealed no evidence of deep venous thrombosis or venous valvular insufficiency. AR 257.

The administrative record contains medical records of Gary DeShazo, D.O., for the period from August 12, 2009 through December 13, 2011. Plaintiff was seen at Dr. DeShazo's office on

August 12, 2009 for a regular check-up.  Her chief complaints related to her recent left knee surgery, arthritis, carpal tunnel in both hands and spasms in the hands.  She also complained of vomiting, nausea and diarrhea.  The printed checklist of symptoms indicated miscellaneous myalgias, stiff joints, back pain, headaches, neck spasm, back tenderness, and neuro weakness.  The doctor's notes on this record are illegible and indecipherable.  AR 321.  On October 8, 2009, the Plaintiff returned for a refill of prescriptions.  She reported an increase in pain due to cold weather.  The checklist of symptoms was the same.  The physician's notes are again illegible and indecipherable.  AR 320.  On December 3, 2009, Plaintiff was seen for follow-up and refill of prescriptions.  The checklist of symptoms again included miscellaneous myalgias, stiff joints, back pain, headache, neck spasm, back tenderness, and neuro weakness.  AR 319.  On January 28, 2010, the Plaintiff complained of frequent headaches, that her left eyelid was tender, that she had a cyst in the left side of the forehead, and left "glute" pain for one week.  She also complained of throbbing ankle pain. The same checklist of symptoms was noted, with an additional listing of anxiety and fatigue.  AR 318.  On March 1, 2010, the Plaintiff reported excess fatigue, together with the previous checklist of symptoms.

On April 22, 2010, Dr. DeShazo's nurse or assistant reported as follows:

> Pt came in & state[d] that she was here for refills but according to the last scripts Dr. DeShazo had given her in March first for mail order & another RX to be filled locally pt was not due for medications.  When DEA was ran we realize pt had picked up 2 Lortab prescriptions in less than 30 days apart.  One was picked up on 3/1/10 & the other on 3/23/10.  Walgreens was questioned on why they had release[d] the medication early they stated pt paid cash & according to them pt had stated she had no insurance.  Statement was made by Marie pharmacist @ Wall.  Also Express Scripts was called & questioned about prescriptions.  Per Express Scripts RX was filled 3/4/10, shipped 3/5/10 can refill 6/3/10 per Dr. DeShazo.  Also pt was informed of drug screens & requested to please kindly give a urine sample & pt refused. [Pt] cancelled appointment [and] has not called or came in since then.

AR 316.

On May 22, 2010, Plaintiff underwent a mental status examination by clinical psychologist, Dr. Kara Cross at the request of the Department of Social Services.  AR 281-285.  Dr. Cross's report states that she conducted a "Mental Status Examination" and that "[n]o documents were

reviewed." AR 281.  Dr. Cross found no evidence of psychosis or signs of psychotic thinking processes.  AR 282-82.  Plaintiff's attention and concentration were adequate enough to establish rapport and complete the evaluation.  Under "Mood and Affect," Dr. Cross stated that "[m]ood and affect were rated by the claimant as being 4 with 0 being no depression and 10 being most depressed."  Dr. Cross conducted a mental status examination of the Plaintiff and found that she was capable of understanding, remembering and carrying out a variety of detailed and complex instructions.  AR 285.  She also found Plaintiff capable of maintaining concentration and attention with adequate sufficiency to carry out instructions on both complex and simple tasks sustained over an eight-hour day in a forty-hour work week.  *Id.*

Under "Present Illness," Dr. Cross noted that Plaintiff reported that she had some mild depression which comes and goes.  The Plaintiff stated that she had never had mental health services.  AR 284.  Dr. Cross also noted that Plaintiff reported multiple problems with her wrist, her neck and her knees.  "She says she is on chronic pain.  She is on carisoprodol, hydrocodone, and ibuprofen."  *Id.*

Dr. Cross reported that Plaintiff described her daily activities as follows:

> She can dress, cook, bathe, do errands, do households chores, shop and operate a motor vehicle.  She takes care of her 12-year old daughter.  She cooks special things for her daughter's Girl Scout group.  She helps her neighbor with her 5-year old son.  She gets along with others.  She helps in neighbor's car pool.

AR 284.

Plaintiff was seen by Dr. Trevor Nogueira on July 29, 2010 for a consultation/disability evaluation at the request of the Social Security Administration.  AR 288-294.  Dr Nogueira reported that on a pain scale of 0 to 10, Plaintiff described her upper back and neck pain as ranging between 6-10, but presently an 8.  Her lower back pain ranged between 4-9, and was presently a 9.  The pain in her knees, ankles and feet ranged between 2-9, and was presently a 6.  *Id*.  Plaintiff reported taking Lortab four times a day, Soma four times a day, and ibuprofen as-needed.  AR 289.  Physical examination revealed a normal gait pattern and Plaintiff was able to walk on her heels and toes with limited squatting due to pain.  AR 289.  Dr. Nogueira noted Plaintiff's Waddell's signs were "3/5." AR 289.  He did not comment on the significance of this finding.

1   Functionally, Dr. Nogueira did not limit Plaintiff's lifting and carrying capabilities, but
2   noted that she could stand and/or walk at least two hours in an 8-hour workday, could sit for six
3   hours in an 8-hour workday, could never climb ladders/scaffolds, kneel, or crawl, could
4   occasionally climb ramps/stairs, stoop/bend, and crouch/squat, and could frequently balance.  AR
5   291-92.  He further noted that she would need to change positions every two hours, but would be
6   environmentally restricted from working around heights, moving machinery, and extreme cold.  *Id*.

7   Plaintiff was seen at Dr. DeShazo's office on July 29, 2010 (the same day as her
8   examination by Dr. Nogueira).  She complained of upper back spasm, together with the same
9   checklist of symptoms noted on previous visits.  AR 315.  On October 21, 2010, Plaintiff called
10  and requested a partial refill for Lortab and Soma due to her rescheduled appointment.  AR 314.
11  Dr. DeShazo approved the request.  *Id*.  On October 26, 2010, Plaintiff called Dr. DeShazo's office
12  again requesting "a few Lortab & Soma until [her] appointment [on] October 28, 2010."  *Id*.
13  Plaintiff alleged that she went out of town and her bottle of pills were confiscated because of an
14  issue with the label.  *Id*.  Dr. DeShazo denied Plaintiff's request and instructed her to wait for her
15  October 28, 2010 appointment.  Plaintiff was seen on October 28, 2010 for follow-up and
16  prescription refills.  She reported bilateral ankle pain and that both of her big toes were numb.  The
17  previous checklist items of symptoms were noted, including anxiety.  The doctor's notes indicated
18  "CTS hands," cervical disc disease, a left knee condition, and occasional neuritis.  AR 313.  On
19  December 16, 2010, Plaintiff requested a refill of her Soma, which was denied because Plaintiff
20  recently received a three (3) month supply of the pain medicine on October 28, 2010.  AR 314.
21  The nurse or medical assistant noted that "Pt was aware of pain mng DEA task force.  Also pain
22  mng referral was mailed."  *Id*.

23  On November 18, 2010, Plaintiff presented to Dr. Kathleen D. Smith at Cameron Medical
24  Center for an initial examination.  AR 341.  She reported that she was involved in a motor vehicle
25  accident on November 16, 2010 and felt immediate pain in her head, neck, and upper extremity
26  regions.  She did not go to the emergency room following the accident.  *Id*.  Plaintiff reported that
27  her left knee pain increased from 5-6/10 prior to the accident to 10/10 after the accident.  AR 342.
28  She reported that the pain in her cervical spine area increased from 5-6/10 to 10/10 after the

10

accident. *Id*. She further reported that she had occasional pain of 3-4/10 after having her bilateral

carpal tunnel repair approximately one year before, which increased to 10/10 after the accident. *Id*.

Dr. Smith noted that Plaintiff had possible cervical radiculopathy, thoracic lumbar strain/sprain, left

shoulder, left knee and bilateral wrist strains/sprains which were sustained as a result of the motor

vehicle accident. AR 343. She recommended that Plaintiff continue chiropractic treatment, have

her left shoulder, left knee, cervical thoracic lumbar area, and bilateral wrist x-rayed, and obtain a

cervical spine MRI. *Id*. On December 15, 2010, Plaintiff presented to Dr. Smith for a limited

office visit. Dr. Smith noted that Plaintiff's MRI showed a disc bulge at the C4-C7 level. AR 344.

Plaintiff was instructed to follow up with a pain management specialist and continue to follow up

with her primary care physician. AR 344.

On November 30, 2010, Plaintiff was seen by Dr. Walter Morris Kidwell at the Pain

Institute of Nevada for a pain management consultation pursuant to a referral from Dr. DeShazo.

AR 338. Plaintiff reported having generalized body pain for the past five years, associated sleep

disturbance, and chronic fatigue. *Id*. Physical examination of Plaintiff revealed 5/5 motor strength

and a decreased range of motion due to pain. AR 339. Dr. Kidwell diagnosed Plaintiff with

fibromyalgia syndrome and cervical degenerative disk disease. AR 340. Dr. Kidwell noted that

Plaintiff "indicated she is not interested in interventional therapy (injections) nor extensive

imaging. She only requests someone to refill her prescriptions." AR 338. Dr. Kidwell gave

Plaintiff the name of a physician who might accept her for chronic pain medications. He stated

"[s]he has an adequate supply of medications to tide over until the end of January." AR 340.

On February 3, 2011, Plaintiff presented to Dr. Sanghamitra Basu at Sans Pain Clinic. AR

475-76. Dr. Basu assessed Plaintiff with "lumbago, degenerative disk disease; possible

fibromyalgia given the multiple tender points over seven to eight areas, unsure if this is related to

her cervical and lumbar disk degeneration or truly fibromyalgia. This may be a working diagnosis;

however, she does have symptoms of cervical radiculopathy." *Id*. He further noted "[a]t this

juncture, she does not want any injectional therapy." *Id*. He continued Plaintiff on Lortab and

Soma. *Id*. Plaintiff subsequently changed her position on injections. On April 5, 2011 and on May

3, 2011, Dr. Basu performed L4-5 transforaminal epidural steroid injections for her degenerative

disc disease and lumbar radiculopathy.  AR 487, 489.

Dr. DeShazo saw Plaintiff on February 21, 2011 at which time her chief complaint was painful bowel movements, sometimes, and hematochezia (bright red blood in stool), sometimes. AR 534.  She also complained of a breast mass or lump, severe joint pain, arthritis, nervousness and anxiety. AR 534-36.  Plaintiff also stated: "I have been having severe pain in my neck with progressive weakness and numbness of my hands.  I must take large amounts of opiates to relieve the pain, but the meds make me very lethargic."  AR 536-37.  The Plaintiff also reported that she had gained 20 pounds during the past year for unknown reasons.  She stated that she was involved in a motor vehicle accident in 2009 that had exacerbated her condition with progressive headaches, fatigue, increased fibromyalgia symptoms, and severe fatigue. AR 537.  Plaintiff reported various symptoms in the head, eyes, respiratory system, cardiovascular system, gastro-intestinal system, musculoskeletal system, psychiatric system, breasts, skin, neurological system, endocrine system, hematologic/lymphatic system, allergic/immunologic, ENT, and genitourinary system.  AR 537-38. Under Assessment, Dr. DeShazo stated that Plaintiff had chronic problems in numerous listed body parts or systems.  AR 540-41. Under "Note" at the end of his assessment, Dr. DeShazo stated:

> It is my opinion to a reasonable degree of medical certainty that this patient is totally disabled based upon the amount of opiate medication required for comfort coupled with the physical disability related to the cervical disc pathology with the progressing carpal tunnel syndrome.  Her hands are very weak and cannot even perform fine manipulation.

AR 541.

Dr. DeShazo again saw the Plaintiff on March 22, 2011.  Under "Chief Complaint," Plaintiff reported being nervous and depressed for the past two or more years.  AR 524.  As in the previous February 21, 2011 report, Dr. DeShazo indicated that Plaintiff had symptoms in numerous body parts or body systems.  AR 526.  The report indicates that Dr. DeShazo performed a physical examination of Plaintiff's body systems, including allegedly performing a male genitourinary examination during which findings were allegedly made with respect to male genitalia.  AR 528. Dr. DeShazo assessed Plaintiff with more than fifty (50) diagnosis, which included, among other conditions, urinary incontinence, hypernasality, depressive disorder, plantar fascitis, and vertigo.

12

AR 531-32.  Dr. DeShazo stated that Plaintiff had been cleared for total thyroidectomy surgery by Dr. Wang.  AR 532.  He further stated:

> Patient is totally disabled in my medical opinion because of the increasing neuropathy of the hands, legs, and decreasing mental status.  She is also unemployable because of the opiate intake.  She was a[t] a school event and fell down the bletchers (sic) because of dysequilibrium and her lower extremities have became (sic) much weaker.  She will need a thorough neurological evaluation regarding the memory decline, dysequilibrium, veritgo, progressive weakness of muscles, increasing pain from fibromyalgia.

AR 532.

On March 23, 2011, Plaintiff contacted Dr. DeShazo's office to request a refill of her prescriptions.  AR 544.  She reported that she left the pills in her car and that someone attempted to steal her car and took her pills and a few things from her car, including her purse.  *Id.*  Plaintiff was advised that she would have to produce the police report before the office could refill her Xanax prescription.  *Id.*  On April 4, 2011, Walgreens contacted Dr. DeShazo's office stating that Plaintiff called early to request a refill of her Xanax.  AR 544.  The pharmacist reported that Plaintiff picked up her pills on March 22, 2014, but stated that her pills turned to dust.  *Id.*

On June 2, 2011, Plaintiff presented to Centennial Hills Hospital Medical Center to undergo x-rays of her left knee.  Dr. Markus Forsythe took four views of Plaintiff's left knee and found no evidence of fracture, dislocation, or sublaxation.  AR 460.  He noted that Plaintiff's bone mineralization was normal and that the articular surfaces and joint spaces were well preserved.  He noted no appearance of osseous lesions and no soft tissue abnormalities.  *Id.*  His impression was that Plaintiff had a normal knee, no acute fracture or dislocation.  *Id.*

Plaintiff again saw Dr. DeShazo on June 13, 2011.  AR 517-523.  She reported that she was experiencing left knee joint pain, lateral knee tenderness and lateral knee pain.  She described the severity of her knee pain as a 7-8 on a scale of 1-10.  She reported knee pain when walking on flat surfaces, walking up or down stairs or hills, while running, kneeling, sitting with legs straight and at night.  AR 517.  Dr. DeShazo again reported symptoms in multiple body areas.  AR 518-19.  It appears he referred her for examination by Dr. Steven Thomas, orthopedic surgeon, and Dr. Daniel Burkhead for pain management.  AR 522.

13

Dr. Steven Thomas saw Plaintiff on June 20, 2011 for her complaints of left knee pain. AR 421. She told Dr. Thomas that she injured her left knee when she fell while walking her dog. *Id*. She also reported that she had fallen three times since that incident. *Id*. Dr. Thomas assessed her with knee pain and recommended physical therapy range of motion exercises. He also discussed the options regarding the medial meniscus tear in her left knee, including no treatment. AR 422. On July 7, 2011, Dr. Thomas performed a partial medial and lateral menisccectomy on Plaintiff's left knee. AR 410- 416. Plaintiff was instructed to begin physical therapy on the first postoperative day. *Id*. Dr. Thomas saw Plaintiff for post-operative follow-up on August 5, 2011. She had moderate discomfort as expected. He noted that she had made good progress thus far and stated that she would be continued on postoperative therapy and rehabilitation. AR 408-09.

On August 25, 2011, Plaintiff presented to Dr. Jason E. Garber, at the Western Regional Center for Brain & Spine Surgery, for neck stiffness, muscle spasm, tenderness, impaired range of motion and shoulder pain. AR 469-72. Dr. Garber's initial diagnosis was cervical degeneration and he scheduled Plaintiff for an MRI and EMG/nerve conduction studies. Dr. Garber saw Plaintiff in follow-up on September 22, 2011. AR 467-68. Dr. Garber noted that there was a broad-based disc herniation at C6-C7 with neural foraminal narrowing. There was no frank spinal canal stenosis or other levels of pathology noted. He referred Plaintiff for pain management. AR 468.

Plaintiff was seen again by Dr. DeShazo on September 12, 2011. AR 509-516. Under "Chief Complaint," Dr. DeShazo noted that the "patient would like to discuss increasing her xanax to a higher milligram." Plaintiff "reported increased anxiety due to increased pain and decreased on financial state." AR 509. Dr. DeShazo reviewed Plaintiff's symptoms and again noted her various symptoms. He stated:

> Patient went to Dr. Burkhead and he referred her to Dr. Navarro, neurologist who did nerve conduction studies on the cervical region and she has progressive nerve degeneration from the cervical discs. She was then referred to Dr. Garber, who is entertaining a cervical fusion due to her deteriorating condition. She is permanently disabled and should be granted social security disability. The anxiety and panic attack was discussed and an increase in the Xanax is warranted due to the severe panic attacks she is experiencing.

AR 515.

14

1    Dr. DeShazo completed a "Treating Physician Questionnaire" on December 13, 2011.  AR

2  592-94.  He stated that he had seen the Plaintiff for two years at the frequency of every 2-3 months.

3  AR 592.  He listed his diagnoses of Plaintiff's condition as follows:  effusion of the left knee,

4  fibromyalgia, cervical spondylosis with myelopathy, and degenerative disc disease, carpal tunnel

5  syndrome-bilateral hands, headaches, progressive nerve degeneration.  He described her prognosis

6  as fair.  He stated that Plaintiff had the following symptoms:  weakness bilateral arms, left worse

7  than right, panic attacks, anxiety, increased headaches, increased anxiety/panic attacks and

8  decreased range of motion.  Dr. DeShazo further stated that Plaintiff had pain in all joints, which

9  was worse in the neck, arms and hands.  He stated that treatment included medications, Xanax,

10  Lortab, and Soma which caused drowsiness.  Dr. DeShazo stated that Plaintiff's impairments had

11  lasted at least twelve months and that she was not a malingerer.  He also indicated that emotional

12  factors contributed to the severity of her symptoms and listed depression, anxiety and stress as

13  contributing factors.  AR 592.  Dr. DeShazo further indicated that Plaintiff was incapable of

14  performing even low stress jobs because "increased stress and panic attacks cause the muscles to

15  tighten up causing increased pain and headaches."  AR 593.  He stated that Plaintiff's symptoms

16  were severe enough to interfere with attention and concentration needed to perform simple work

17  tasks on a constant basis.  He indicated that Plaintiff had decreased range of motion in the left knee

18  and cervical spine bilaterally, and had hand weakness, left greater than right.  He also stated that

19  Plaintiff experienced neck spasms on the left at C3-7 and on the right at C4-7.  *Id.*

20    Dr. DeShazo stated that Plaintiff would need a job that permitted her to shift positions at

21  will from sitting, standing or walking and that she would sometimes need to take unscheduled

22  breaks in an eight hour work day.  He estimated this would happen every 30 minutes and the breaks

23  could last from 15 to 20 minutes before Plaintiff was ready to return to work.  Dr. DeShazo also

24  indicated that Plaintiff used a cane.  He indicated that the Plaintiff could not squat, could walk on

25  toes "a few inches" and walk on heals "a few inches."  AR 593.

26    Dr. DeShazo stated that Plaintiff could sit or stand/walk for less than 2 hours in an eight

27  hour day; that she could rarely lift less than 10 pounds and never lift more than 10 pounds.  He

28  stated that she had decreased grip strength bilaterally 3/5.  He stated that Plaintiff's impairments

1   were likely to produce good days and bad days and he estimated that she would miss more than 4

2   days of work per month as a result of her impairments or treatment.  He did not provide an earliest

3   date to which the description of symptoms and limitations in the questionnaire applied.  AR 594.

4       **D.   ALJ's Decision**

5       In his decision dated January 5, 2012, the ALJ found that Plaintiff was not disabled within

6   the meaning of the Social Security Act from November 21, 2008, through the date of his decision,

7   because the Plaintiff possessed sufficient residual functional capacity ("RFC") to perform her past

8   relevant work.  AR 32.  In reaching this conclusion, the ALJ followed the five-step process set forth

9   in 20 C.F.R. § 404.1520(a)-(f).  First, the ALJ found that Plaintiff had not engaged in substantial

10   gainful activity since the alleged onset date of November 21, 2008.  AR 27.  Second, he found that

11   the Plaintiff has severe impairments including "fibromyalgia, carpal tunnel syndrome, and

12   degenerative disc disease of the lumbar and cervical spine."  AR 32.  He further found that

13   Plaintiff's alleged hiatal hernia, thyroid nodule, and anxiety disorder did not constitute severe

14   impairments, because they were either controlled by medication or did not last a continuous twelve

15   month period.  AR 27.  At step three, the ALJ found that Plaintiff's impairments did not,

16   individually or in combination, meet the requirements of and were not medically equivalent to any

17   condition listed in Appendix 1, Subpart P, of 20 C.F.R. § 404.1520(c) and § 416.920(c).  AR 32.

18       Prior to step four of the sequential analysis, the ALJ found that Plaintiff had the residual

19   functional capacity ("RFC") to lift and carry a maximum of 10 pounds occasionally and less than

20   10 pounds frequently.  She could for six hours in an 8-hour work day, and stand and/or walk for

21   two hours in an 8-hour workday. The ALJ stated that the exertional limitations were consistent with

22   the ability to perform work at a full range of "sedentary work" as defined in 20 CFR §404.1567(b)

23   and §416.967(b).  AR 28.  The ALJ noted that Plaintiff alleged disability due to fibromyalgia,

24   carpel tunnel syndrome, and degenerative disc disease of the cervical and lumbar spine.  The ALJ

25   stated, however, that "[t]here are minimal findings in the medical evidence to support any of these

26   impairments, however, there was evidence of possible medication preoccupation and abuse."  AR

27   28.  The ALJ went on to summarize the medical reports and records of Dr. Farrow and Dr. Perry

28   who examined Plaintiff and treated her carpal tunnel in late 2008; the subsequent diagnostic testing

of her cervical spine in 2010; her follow-up examinations and/or treatment with Dr. Perry and Dr. Lee in 2009; and her left knee arthroscopic surgery performed by Dr. Thomas in July 2009.  AR 28-29.

The ALJ then summarized Dr. Nogueira's consultive physical examination of Plaintiff on July 29, 2010.  The ALJ noted that Plaintiff reported to Dr. Nogueira that she suffered from pain in all joints of her body, as well as weakness, numbness and tingling and that she took four Lortab and four Soma per day for her symptoms.  The ALJ also noted, however, Dr. Nogueira's examination findings that Plaintiff had a normal gait pattern, was able to walk on her heels and toes, and was able to perform a partial squat.  The ALJ also noted Dr. Nogueira's findings regarding Plaintiff's residual physical functional capacity which were consistent with the ALJ's RFC determination.  The ALJ also noted Dr. Nogueira's notation of "Waddell's symptoms 3/5."  The ALJ gave Dr. Nogueira "great weight as an examining physician."  AR 29.

The ALJ further noted that subsequent to Dr. Nogueira's examination on July 29, 2010, Plaintiff was involved in a motor vehicle accident on November 16, 2010.  He noted that she did not receive any treatment immediately after the accident, and that she thereafter saw Dr. Smith on November 18, 2010, who recommended conservative treatment. AR 30.  The ALJ also referenced that Plaintiff was diagnosed with fibromyalgia on November 30, 2010, but that "she stated that she was not interested in any treatment but only wanted a refill on her medication."  AR 30.

The ALJ summarized Dr. Gary DeShazo's treatment records and medical opinions as follows:

> The claimant treated with Dr. DeShazo four times.  He diagnosed her as "acute" or "chronic" for fifty different impairments, many of which had never been mentioned before, including depression, anxiety, and vertigo.  On December 31, 2011, Dr. DeShazo completed a medical source statement.  He placed her at a less than sedentary exertional level, due to several alleged physical and mental conditions.  I did not credit this opinion, as there was no objective justification for his opinion by the minimal medical evidence.

AR 30.

In footnotes to this passage, the ALJ noted that Dr. DeShazo "only submitted records for February 21, 2011, March 22, 2011, June 13, 2011, and September 12, 2011, despite claiming that

1   he treated her every two to three months for two years." AR 30 n. 1.  He also noted that Dr.

2   DeShazo indicated that he performed a male genitourinary assessment on Plaintiff.  *Id.*, n. 2.  Later

3   in his decision, the ALJ made reference to the 2010 and 2011 medical records of Plaintiff's

4   "primary care physician" which revealed possible medication abuse by Plaintiff.  AR 30-31.  The

5   ALJ apparently overlooked that the referenced records were those of Dr. DeShazo.

6       The ALJ also cited the May 22, 2010 psychological consultive evaluation performed by Dr.

7   Kara Cross, Ph.D. which noted that Plaintiff had intermittent, mild depression, and had never had

8   mental health treatment.  The ALJ also noted Dr. Cross's finding that Plaintiff had the ability to

9   maintain concentration and attention with adequate sufficiency to carry out instructions on both

10  complex and simple tasks sustained over an 8-hour day in a 40-hour work week.  The ALJ also

11  gave great weight to Dr. Cross's opinions as an examining physician.  AR 30.

12      The ALJ found that Plaintiff's alleged disabling symptoms were not credible.  He stated that

13  "[d]espite allegations of multiple physical limitations, the objective findings did not support the

14  presence of a medical determinable impairment that could be expected to cause symptoms of the

15  type and severity she alleged."  AR 30.  The ALJ stated that Plaintiff had arthroscopy on her left

16  knee which rendered her unable to work for two weeks and that she otherwise received

17  conservative treatment for her back and wrist.  The ALJ further stated:  "In fact, Dr. Nogueira stated

18  that she appeared to exaggerate her symptoms, when he indicated that she was 3/5 for Waddell's

19  signs of malingering.  The aforementioned observation further detracted from her credibility."  AR

20  30.  The ALJ also cited the evidence of "possible medication abuse" which indicated "medication

21  preoccupation and possible abuse."  AR 30-31.  The ALJ further stated that Plaintiff had "only been

22  pursuing minimal treatment, which has all been conservative."  He further stated that "[f]or the

23  medications that she was prescribed, the record indicated generally that those side effects were mild

24  and would not have interfered with the claimant's ability to perform work activities in any

25  significant manner, if she took them as prescribed."  AR 31.  The ALJ also stated that Plaintiff's

26  reported statement to Dr. Cross that she had no limitations in her activities of daily living,

27  significantly reduced her credibility as far as the impact of her alleged impairments on her activities

28  of daily living.  The ALJ stated that Plaintiff's testimony conflicted with the information she

provided to Dr. Cross in May 2010 and the information provided by her husband in his third party statement in April 2010.  AR 31.

Based on his determination of the Plaintiff's residual functional capacity, the ALJ determined that she was able to do her past relevant work as an officer manger (DOT: 169.167-030) and administrative assistant (DOT: 169.176-010), both of which are listed as sedentary occupations.  AR 31.

## DISCUSSION

### I.    Standard of Review.

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)).  In order to enable the court to properly determine

1   whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings

2   "should be as comprehensive and analytical as feasible and, where appropriate, should include a

3   statement of subordinate factual foundations on which the ultimate factual conclusions are based."

4   *Lewin*, 654 F.2d at 635.

5          In reviewing the administrative decision, the District Court has the power to enter "a

6   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

7   with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In the alternative, the

8   District Court "may at any time order additional evidence to be taken before the Commissioner of

9   Social Security, but only upon a showing that there is new evidence which is material and that there

10  is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

11      **II.      Disability Evaluation Process**

12          To qualify for disability benefits under the Social Security Act, a claimant must show that:

13              (a)     he/she suffers from a medically determinable physical or mental
                        impairment that can be expected to result in death or that has lasted
14                      or can be expected to last for a continuous period of not less that
                        twelve months; and
15
                (b)     the impairment renders the claimant incapable of performing the
16                      work that the claimant previously performed and incapable of
                        performing any other substantial gainful employment that exists in
17                      the national economy.

18  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

19          The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179,

20  182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant establishes an inability to

21  perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can

22  perform other substantial gainful work that exists in the national economy. *Reddick v. Chater*, 157

23  F.3d 715, 721 (9th Cir. 1998).

24      **III.     Analysis of the Plaintiff's Alleged Disability**

25          Social Security disability claims are evaluated under a five-step sequential evaluation

26  procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.

27  2001).  If a claimant is found to be disabled, or not disabled, at any point during the process, then

28  no further assessment is necessary.  20 C.F.R. § 404.1520(a).  At the first step, the Commissioner

determines whether a claimant is currently engaged in substantial gainful activity.  *Id.* § 416.920(b).

If so, the claimant is not considered disabled.  *Id.* § 404.1520(b).  Second, the Commissioner

determines whether the claimant's impairment is severe.  *Id.* § 416.920(c).  If the impairment is not

severe, the claimant is not considered disabled.  *Id*. § 404.152(c).  Third, the claimant's impairment

is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1.  The claimant

will be found disabled if the claimant's impairment meets or equals a listed impairment.  *Id.* §

404.1520(d).  If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant

can perform past relevant work.  *Id*. § 416.920(e).  If the claimant can engage in past relevant work,

then no disability exists.  *Id.* § 404.1520(e).  If the claimant cannot perform past relevant work, the

Commissioner has the burden to prove the fifth and final step by demonstrating that the claimant is

able to perform other kinds of work.  *Id.* § 404.1520(f).  If the Commissioner cannot meet his or her

burden, the claimant is entitled to disability benefits.  *Id.* § 404.1520(a).

Plaintiff asserts that the ALJ erred prior to or at step four of the sequential analysis by

failing to articulate legitimate reasons for rejecting the opinion of a treating physician and by failing

to provide clear and convincing reasons for finding Plaintiff not credible when determining her

residual functional capacity.

> **A.      Whether ALJ Provided Specific and Legitimate Reasons for Rejecting the Opinions of Plaintiff's Treating Physician and Giving Great Weight to the Opinions of the Examining Physicians.**

The standards governing the weight to be given to the opinions of treating, examining and

reviewing physicians were recently summarized in *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th

Cir. 2014) as follows:

> Generally, the opinion of a treating physician must be given more
> weight than the opinion of an examining physician, and the opinion
> of an examining physician must be afforded more weight than the
> opinion of a reviewing physician. *Holohan v. Massanari,* 246 F. 3d
> 1195, 1202 ( 9th Cir. 2001); 20 C.F.R. § 404.1527(c).  "If a treating
> physician's opinion is well-supported by medically acceptable clinical
> and laboratory diagnostic techniques and is not inconsistent with the
> other substantial evidence in [the] case record, [it will be given]
> controlling weight." *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007)
> (internal quotations omitted) (alterations in original); *see also* 20
> C.F.R. § 404.1527(c)(2)).  To reject an uncontradicted opinion of a
> treating physician, the ALJ must provide "clear and convincing

reasons that are supported by substantial evidence." *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir.2005).

Even if a treating physician's opinion is contradicted, the ALJ may not simply disregard it. The ALJ is required to consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion. *Orn,* 495 F.3d at 631; 20 C.F.R. § 404.1527(c)(2). These factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, the "[n]ature and extent of the treatment relationship" between the patient and the treating physician, the "[s]upportability" of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole. 20 C.F.R. § 404.1527(c)(2)-(6). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Orn,* 495 F.3d at 631. Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability. *Holohan,* 246 F. 3d at 1202– 03. An ALJ may only reject a treating physician's contradicted opinions by providing "specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec. Admin.,* 528 F.3d 1194, 1198 (9th Cir. 2008); *accord Holohan,* 246 F. 3d at 1202– 03.

Plaintiff argues that the ALJ did not articulate specific and legitimate reasons based on substantial evidence for rejecting the opinions of Dr. DeShazo. The Court finds that the ALJ had reasonable grounds to question Dr. DeShazo's opinions based on the numerous symptoms or impairments referenced in his February and March 2011 reports, as well as the reference to performing a male genitourinary examination which obviously did not occur. AR 30, n. 2, and 528. The ALJ erred, however, in stating that the administrative record showed that Plaintiff only treated with Dr. DeShazo four times in 2011, and that many of the impairments he found "had never been mentioned before, including depression, anxiety and vertigo." AR 30, n. 1. The ALJ clearly overlooked Dr. DeShazo's 2009 and 2010 office visit notes and the telephone communications between his staff and Plaintiff. (Although the ALJ mentioned those records with reference to Plaintiff's attempts to obtain additional prescriptions, he apparently failed to recognize that they were Dr. DeShazo's records). Dr. DeShazo's earlier records indicated that Plaintiff complained of anxiety on January 28, 2010, July 29, 2010, and October 28, 2010  AR 313, 315, 318. Plaintiff also reported mild or moderate depression to Dr. Cross on May 22, 2010. Dr. Nogueira noted that Plaintiff reported sadness, depression, anxiety and problems with sleep on July 29, 2010. AR 289. Plaintiff told Dr. Kidwell on November 30, 2010 that she had depression, a five year history of

overall body pain, and had associated sleep disturbance and chronic fatigue.  AR 338.

The Commissioner argues that the ALJ's mistake regarding Dr. DeShazo treatment records is "harmless error."  The Court cannot agree.  The regulation state that the Social Security Administration generally gives "more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive reports."  20 C.F.R. §404.1527(c)(2).  The ALJ discounted Dr. DeShazo's opinions, in part, based on lack of evidence that he actually saw or treated Plaintiff during the two years preceding his examinations in 2011, and that there were no prior records indicating that Plaintiff was suffering from depression or anxiety.

Although Dr. DeShazo's 2011 reports referenced numerous symptoms or examination findings, his opinion that Plaintiff is disabled was based on a more limited number of medical conditions and symptoms.  In his February 21, 2011 report, Dr. DeShazo stated that Plaintiff was "totally disabled based on the amount of opiate medication required for comfort coupled with the physical disability related to cervical disc pathology with progressing carpal tunnel syndrome."  AR 541.  In his March 22, 2011 report, Dr. DeShazo stated that Plaintiff was totally disabled because of the increasing neuropathy of her hands, legs and decreasing mental status.  He also stated that she was unemployable because of opiate intake.  He further noted Plaintiff's reports of having fallen due to disequilibrium and weak lower extremities, and stated that she needed a thorough neurological evaluation regarding memory decline, disequilibrium, vertigo, progressive weakness of muscles, and increasing pain from fibromyalgia.  AR 532.  In his December 13, 2011 "Treating Physician Questionnaire," Dr. DeShazo indicated that Plaintiff was disabled based on his previous diagnoses of her condition, and her ongoing problems with pain in all joints, headaches, bilateral arm weakness, anxiety/panic attacks and decreased range of motion.  He also noted her continued use of Xanax, Lortab and Soma.  AR 592-94.

The other medical records establish that Plaintiff suffered from carpal tunnel syndrome for which she underwent surgery in November 2008 and that she continued to complain of hand or arm

pain and weakness after the surgery.  Plaintiff also suffered from left knee pain and instability for which she underwent arthroscopic surgery in July 2009 and again in 2011.  In August, 2011,  Dr. Garber stated that Plaintiff had "a broad-based disc herniation at C6-C7 with neural foraminal narrowing, but without frank spinal canal stenosis or other levels of pathology.  He referred her for pain management.  In November 2010, Dr. Kidwell also found that Plaintiff had symptoms and finding on examination consistent with fibromyalgia syndrome.  AR 340.

The ALJ gave great weight to the opinions of the examining consulting psychologist, Dr. Cross, and physician, Dr. Nogueira.  AR 29-30.  The ALJ placed great weight on Dr. Cross's opinion that Plaintiff had the ability to maintain concentration and attention to carry out complex and simple tasks over an 8-hour day in a 40-hour work week.  The ALJ also found Plaintiff's alleged description of her daily activities to Dr. Cross was more credible than her written statements submitted to Social Security or her hearing testimony.  Although Dr. Cross obtained a history from Plaintiff regarding her illnesses and her medical treatment, she did not review any of Plaintiff's medical records and there is no indication that she was aware of the severity of Plaintiff's complaints as expressed to treating or examining physicians, or of the issues relating to Plaintiff's use of or dependency on opiate medications for relief of her pain symptoms.

Dr. Nogueira interviewed and performed a physical examination of Plaintiff.  He also reviewed medical records provided to him, including Dr. Perry's, Dr. Lee's and Dr. Thomas's records relating to Plaintiff's carpal tunnel and upper extremity problems, cervical spine condition and left knee condition.  Dr. Nogueira noted that Plaintiff's complaints of high levels of pain in the neck, upper back and lower back, as well as moderate pain in the knees, ankles and feet.  AR 288. He also noted her neurological complaints of weakness, numbness and tingling, as well as her psychological complaints of sadness, depression, anxiety and problems with sleep.  AR 289.  Dr. Nogueira's physical examination findings, however, indicated that Plaintiff's complaints of pain and weakness were disproportionate to the physical examination findings.  He reported that "Waddell was 3/5."  AR 289.

The ALJ interpreted Dr. Nogueira's report as stating "that she appeared to exaggerate her symptoms, when he indicated she was 3/5 for Waddell's signs of malingering."  AR 30.  The

Commissioner states, however, that Dr. Nogueira's findings regarding Waddell's test score

"suggested that her complaints did not have a direct anatomical cause and were influenced by non-

physical factors."  *Cross-Motion (#19), pg. 15.*  In this regard, the Commissioner states:

> As noted above, the Waddell's signs assess whether a patient: (1) has
> tenderness to superficial light touch that would not normally result in
> pain or tenderness, with no anatomical basis, (2) demonstrates
> improved performance on physical tests when distracted from the
> formal testing, (3) exhibits sensation or motor function disturbances
> that do not follow an anatomical pathway, (4) overreacts to stimuli,
> and (5) complains of pain in response to simulated testing.  Positive
> findings indicate a lack of direct anatomical cause for a patient's
> symptoms.  Laura Jensen, M.D., <u>Nonorganic findings – What are
> they?</u>, BC Medical Journal, Vol. 51, No. 3, Apr. 2009, at 106;
> available at http://www.bcmj.org/icbc/nonorganic-
> findings%E2%94what-are-they (last visited Feb. 18, 2014).

*Cross-Motion (#19), pg. 15, n. 10.*

The same article states that "[t]he presence of nonorganic findings does not mean the pain is

imagined or that the person is malingering.  Nonorganic findings, especially findings in three or

more of the five types, indicate psychological factors that need to be considered in the management

of patients.  Because these factors may potentially slow or complicate the recovery from injury,

their early recognition and attention may expedite a more complete and timely recovery.

Behavioral approaches to pain management, including motivational techniques, are more likely to

provide benefit than medical imaging and interventions, which are relatively contraindicated."

Laura Jensen, M.D., <u>Nonorganic findings – What are they?</u>, BC Medical Journal, Vol. 51, No. 3,

Apr. 2009, at 106; available at http://www.bcmj.org/icbc/nonorganic-findings%E2%94what-are-

they (reviewed by the Court on October 31, 2014).

The Commissioner argues that "[w]hile the ALJ's notation that Dr. Nogueira specifically

found that Plaintiff exaggerated her symptoms is perhaps an overstatement, the evidence in the

record still supports the ALJ's credibility findings, and thus any overstatement is harmless."  *Cross-

Motion (#19), pgs 15-16, n. 11.*  Again, the Court cannot agree.  Malingering involves the deliberate

production or claim of false or grossly exaggerated complaints to avoid duty or work or to obtain

some secondary gain.  Dr. Nogueira made no statement in his report that Plaintiff was intentionally

exaggerating her symptoms or that she was malingering.  Dr. Cross made no reference to

25

exaggeration of symptoms or malingering in her report.  The records of the other physicians who examined Plaintiff contain no indication that they found evidence of malingering.  Dr. DeShazo affirmatively stated in his December 13, 2011 questionnaire response that Plaintiff was not a malingerer.  AR 592.  The ALJ's interpretation of Dr. Nogueira's report as indicating exaggeration of symptoms or malingering provided him with additional grounds to accept Dr. Nogueira's opinion regarding Plaintiff's physical residual functional capacity and to reject Dr. DeShazo's opinion.  It also provided the ALJ with grounds to reject the credibility of Plaintiff's statements regarding the severity of her pain and other symptoms.  The ALJ's misinterpretation of Dr. Nogueira's findings regarding the Waddell's signs therefore is not harmless error.

**B.      Whether the ALJ Provided Clear and Convincing Reasons for Finding that Plaintiff's Testimony Regarding the Severity of Her Pain and Other Symptoms Was Not Credible.**

The ALJ must consider all of the claimant's symptoms, including pain, which "can be reasonably accepted as consistent with the objective medical evidence, and other evidence."  *See* C.F.R. § 404.1529(a).  The Commissioner must evaluate such symptoms under a two-step analysis.  *See* Social Security Ruling 96-7p.  First, the Commissioner must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms.  *Id*.  In the second step, the Commissioner must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  *Id*.  Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.  *See Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional

26

1    limitations.  *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996);  *see also Orteza v. Shalala*,

2    50 F.3d 748, 749-50 (9th Cir. 1995).  The ALJ may additionally employ ordinary techniques of

3    credibility evaluation, such as weighing inconsistent statements regarding symptoms by the

4    claimant.  *Id.*  The ALJ may not, however, make a negative credibility finding "solely because" the

5    claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence."

6    *See Robbing v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).  While subjective pain

7    testimony cannot be discredited on the sole ground that it is not fully corroborated by objective

8    medical evidence, the medical evidence is still a relevant factor in determining the severity of the

9    claimant's pain and its disabling effects.  *See* C.F.R. § 404.1529; *see also Rollins v. Massanari*, 261

10   F.3d 853, 857 (9th Cir. 2001).

11        Plaintiff argues that the ALJ improperly discredited her testimony regarding the severity of

12   her pain and other symptoms on the ground that her allegations were unsupported by objective

13   medical evidence.  *Motion for Reversal (#16), pg. 10.*  The ALJ found that "[t]he claimant was not

14   credible because her statements were inconsistent with the medical evidence of record pursuant to

15   SSR 96-7p."  AR 32.  As indicated above, the ALJ cited Dr. Nogueira's finding regarding the

16   Waddell's signs as further detracting from Plaintiff's credibility.  AR 30.  The ALJ also cited

17   Plaintiff's possible medication "preoccupation and abuse" as diminishing her credibility.  AR 30-

18   31.  The ALJ also noted several instances in which Plaintiff opted for pain medication and rejected

19   other forms of treatment such as injections or therapy.  AR 31.  He also noted diagnostic tests

20   which showed that Plaintiff's "left hand was normal, her right knee was normal, and her right hand

21   was normal," and that Plaintiff was neurologically intact.  AR 31.

22        The ALJ found that the claimant's testimony regarding her functional limitations was

23   contradicted by the information that she provided to Dr. Cross in May 2010, and the information

24   provided by her husband in April 2010.  AR 31.  Dr. Cross's brief summary of Plaintiff's daily

25   activities makes no reference, either way, to limitations or absence of limitations in Plaintiff's

26   ability to perform those activities.  In his April 13, 2010 statement, Plaintiff's husband stated that

27   the claimant engaged in a number of daily activities including cooking, cleaning, caring for a minor

28   child and pets, shopping, and paying bills.  AR 27.  He also indicated that Plaintiff was physically

limited in her activities due to pain and was only able to sleep three to four hours a night because of her pain. AR 184-85. Plaintiff's own written statements and testimony indicate that she was able to perform various household and family tasks that would be consistent with the ability to perform sedentary work. However, she also stated that performing those tasks caused increased pain, and that she needed to take many breaks and to rest for an extended period before completing her tasks.

The Ninth Circuit has stated "that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more that merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014), citing *Smolen v. Chater*, 80 F.3d, 1273, 1287 n. 7 (9th Cir. 1996) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferrable to a work environment where it might be impossible to rest periodically or take medication."). In this case, the Plaintiff stated she performed a variety of household tasks, but that she experienced significant pain while doing so, which required her to take many breaks and rest during the day. She also sought relief through pain medication which caused her to become drowsy. If the opinions of Plaintiff's treating physician Dr. DeShazo are credited, it also appears that she experienced a progressive worsening of her symptoms through the end of 2011, consistent with her hearing testimony that her ability to perform household tasks had diminished with her increasing symptoms.

The ALJ also discredited Plaintiff's testimony based on the allegedly false statements she made in pursuit of prescription refills before she was otherwise entitled to obtain them. While this evidence legitimately casts doubt on Plaintiff's character for truthfulness, the allegedly false statements were made in an effort to obtain additional pain medication which coincides with Dr. DeShazo's and other physician's opinions that Plaintiff had become focused or dependent on the use of opiate medication for relief of her pain, and that there is an emotional or psychological component to Plaintiff complaints of disabling pain and weakness.

The ALJ also based his credibility determination on his misinterpretation of the Waddell's signs as indicating that Plaintiff was exaggerating her symptoms or malingering. The other

credibility factors, standing alone, do not provide clear and convincing reasons for rejecting the credibility of Plaintiff's statements and testimony regarding the severity of her pain and other symptoms.  The medical evidence in this case clearly indicates that there is a psychological component to Plaintiff's complaints of severe pain, weakness and fatigue.  Plaintiff has also been diagnosed with fibromyalgia.  Courts have recognized that fibromyalgia is a disabling impairment and that there are no objective tests that can conclusively confirm the disease.  *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003).  Dr. DeShazo indicated in his March 2011 report that Plaintiff needs a thorough neurological evaluation regarding  memory decline, disequilibrium, veritgo, progressive weakness of muscles, and increasing pain from fibromyalgia.  Although Plaintiff was subsequently evaluated by a neurologist with respect to her cervical spine area, it does not appear that she has been medically evaluated as Dr. DeShazo recommended.

Based on the foregoing, the Court concludes that the ALJ's January 5, 2012 decision denying Plaintiff's claim should be reversed based the ALJ's erroneous reasons for rejecting Dr. DeShazo's opinions and his erroneous determination that the Waddell's signs indicated that Plaintiff was exaggerating her symptoms and malingering.

Plaintiff argues that this case should be remanded for the determination and payment of disability benefits.  "Usually, [i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded."  *Garrison v. Colvin*, 759 F.3d at 1019, quoting  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (internal quotation marks and citation omitted).  *Garrison* notes, however, that "every Court of Appeals has recognized that in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits."  *Id.* (citations omitted).  "Courts have generally exercised this power when it is clear from the record that a claimant is entitled to benefits, observing on occasion that inequitable conduct on the part of the Commissioner can strengthen, though not control, the case for such remand."  *Id.*  The court noted that in *Carney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396 (9th Cir. 1988) ("*Carney II*"):

> We held that "where there are no outstanding issues that must be
> resolved before a proper disability determination can be made, and
> where it is clear from the administrative record that the ALJ would be

1  required to award benefits if the claimant's excess pain testimony was
2  credited, we will not remand solely to allow the ALJ to make specific
   findings regarding that testimony. Rather, we will ... take that testimony
3  to be established as true." *Id.* at 1401. We explained that this credit-as-
   true rule is designed to achieve fairness and efficiency.

4  *Garrison*, 759 F.3d at 1019.

5     The Ninth Circuit has established a three-part credit-as-true standard which must be

6  satisfied in order to remand a case to an ALJ with instructions to calculate and award benefits: (1)

7  the record has been fully developed and further administrative proceedings would serve no useful

8  purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether

9  claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited

10 as true, the ALJ would be required to find the claimant disabled on remand. *Garrison*, at 1020,

11 citing *Ryan v. Commissioner of Social. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008); *Lingenfelter v.*

12 *Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007);

13 *Bannock v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen v. Chater*, 80 F.3d 1273, 1292

14 (9th Cir. 1996).

15    *Garrison* states that it has been held to be an abuse of discretion not to remand with

16 direction to make payment when all three conditions are met. *Id.* at 1020. The court noted,

17 however, that in *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003), it cautioned that the credit-as-

18 true rule may not be dispositive on remand in all cases and that the rule envisions some flexibility.

19 The court states:

20    *Connett*'s "flexibility" is properly understood as requiring courts to
   remand for further proceedings when, even though all conditions of
21 the credit-as-true rule are satisfied, an evaluation of the record as a
   whole creates serious doubt that the claimant is, in fact, disabled.
22 That interpretation best aligns the credit-as-true rule, which preserves
   efficiency and fairness in a process that can sometimes take years
23 before benefits are awarded to needy claimants, with the basic
   requirement that a claimant be disabled in order to receive benefits.
24 Thus, when we conclude that a claimant is otherwise entitled to an
   immediate award of benefits under the credit-as-true analysis,
25 *Connett* allows flexibility to remand for further proceedings when the
   record as a whole creates serious doubt as to whether the claimant is,
26 in fact, disabled within the meaning of the Social Security Act.

27 *Garrison*, 759 F.3d at 1021.

28 . . .

30

1    In this case, the elements of the credit-as-true rule are arguably satisfied. The ALJ relied on
2    erroneous interpretations of the medical records in rejecting the opinions of Plaintiff's treating
3    physician, Dr. DeShazo, and in rejecting the credibility of Plaintiff's testimony regarding the
4    severity of her pain and other symptoms. If Dr. DeShazo's opinions and Plaintiff's testimony were
5    fully credited, the ALJ would be required to find her disabled on remand. Plaintiff, however, does
6    report pain and other symptoms that appear to be out of proportion to medical impairments from
7    which she suffers, and she appears to be able to perform a variety of daily activities that are
8    consistent with the performance of sedentary work, depending on the extent that she is limited from
9    performing such tasks because of pain, weakness, fatigue, depression, anxiety and the effects of
10   medication. Dr. DeShazo stated in March 2011 that Plaintiff needed a thorough neurological
11   evaluation regarding the memory decline, disequilibrium, veritgo, progressive weakness of muscles
12   and increasing pain from fibromyalgia. Such an evaluation was not conducted, and to that extent,
13   the record has not been fully developed. There is also doubt as to when Plaintiff's symptoms
14   reached a level that disabled her from performing any work.

15   The Court finds that remand to permit the Commissioner, if she so chooses, to obtain a
16   neurological evaluation of Plaintiff as recommended by Dr. DeShazo, is appropriate in order to
17   fully develop the record. If the Commissioner elects not to obtain such an evaluation, then Dr.
18   DeShazo's medical opinions and Plaintiff's testimony regarding the severity of her pain and other
19   symptoms should be fully credited and Plaintiff should be granted disability benefits.

**CONCLUSION**

21   Having reviewed, considered and weighed both the evidence that supports and the evidence
22   that detracts from the ALJ's decision, the Court finds the ALJ's decision that Plaintiff has the
23   residual functional capacity to perform sedentary work is not supported by substantial evidence.
24   The administrative law judge did not provide specific and legitimate reasons for discounting the
25   opinion of Plaintiff's treating physician, Dr. DeShazo, and did not provide clear and convincing
26   reasons for finding that Plaintiff's testimony was not credible. Accordingly,

27   . . .

28   . . .

31

1

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (#16) be **granted**, and that the Defendant's Cross Motion to Affirm (#19) be **denied**, and that this case be remanded to the Social Security Administration for further proceedings as recommended.

## NOTICE

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. Appeals may been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 7th day of November, 2014.

_George Foley, Jr._
_____
GEORGE FOLEY, JR.
United States Magistrate Judge